IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 1, 2022

## IN RE NAOMI B.

**Appeal from the Chancery Court for Washington County**
**No. 21-AD-0006      John C. Rambo, Chancellor**

_____

### No. E2021-00892-COA-R3-PT

_____

This appeal concerns termination of parental rights. Paternal grandparents Russell B. ("Grandfather") and Louella B. ("Grandmother") ("Grandparents," collectively) filed a petition in the Chancery Court for Washington County ("the Trial Court") seeking to terminate the parental rights of Alexandria Y. ("Mother") and Ricky B. ("Father") to their minor child, Naomi B. ("the Child"). After a hearing, the Trial Court entered an order terminating Mother's and Father's parental rights to the Child. Mother and Father appeal. Grandparents raise additional issues as appellees. We find, *inter alia*, that in addition to the grounds found by the Trial Court, the proof is clear and convincing in support of the grounds alleged by Grandparents of abandonment by failure to visit against Mother and persistent conditions against both Mother and Father. We find further, as did the Trial Court, that termination of Mother's and Father's parental rights is in the Child's best interest. We affirm the judgment of the Trial Court as modified, resulting in affirmance of the termination of Mother's and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

M. Stanley Givens, Johnson City, Tennessee, for the appellant, Alexandria Y.

Mark W. McFall, Johnson City, Tennessee, for the appellant, Ricky B.

Rachel Ratliff, Johnson City, Tennessee, for the appellees, Russell B. and Louella B.

# OPINION

## Background

The Child was born to Mother and Father in August 2018. In December 2018, the Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Unicoi County ("the Juvenile Court") for court-ordered services and for a finding of dependency and neglect concerning the Child. In February 2019, the Juvenile Court entered a protective custody order transferring custody of the Child to Grandparents. In March 2019, an adjudicatory hearing was held before the Juvenile Court. In April 2019, the Juvenile Court entered an order finding the Child dependent and neglected based upon the parties' stipulation. The Juvenile Court permitted Mother and Father supervised visitation with the Child, to be supervised by Grandparents or their designee. After a June 2019 hearing, the Juvenile Court ordered Mother and Father to pay $30.00 and $50.00 per month in child support, respectively. Following a February 2020 hearing, the Juvenile Court entered an order stating that the Child would remain in Grandparents' custody with Mother and Father having supervised visitation at Grandparents' discretion. As a prerequisite for reunification with the Child, Mother and Father were required to: obtain and maintain safe and stable housing; obtain and maintain a legal source of income; follow all of the recommendations of their parenting assessments; and resolve all legal issues. On January 8, 2021, Grandparents filed their Petition for Termination of Parental Rights and for Adoption by Relative in the Trial Court. In June 2021, a hearing was conducted before the Trial Court on Grandparents' termination petition. Grandfather testified first. Grandfather is the Child's grandfather by his marriage to Grandmother. The Child had been in Grandparents' care and custody since February of 2019. Grandparents lived in Washington County as of the day of the hearing. Living with Grandfather were Grandmother, the Child, and Grandparents' youngest son, Russell. Grandfather was shown a record he kept regarding parental visitation. The record reflected a parental visit on September 7, 2020, and a missed visit on September 24, 2020. There was another missed visit on October 2, 2020. Mother cancelled the October 2nd visit an hour-and-a-half beforehand, as "she said that she couldn't get a ride." Neither parent visited that day. A parental visit occurred later that October, on the 21st. Grandfather stated: "[Father] asked for a visit on November lst. We offered -- but they weren't able to attend on the lst. We offered a video visit, also, and did not -- they were -- they didn't do it." However, a parental visit took place on November 19, 2020. Father visited the Child on December 8, 2020, "and was late." Mother did not attend a visit scheduled for her on December 18, 2020. Father was out of town that day. Grandfather stated that Facebook Messenger was the primary method he used to communicate with Mother and Father. Regarding the procedure for setting up visits, Grandfather testified: "We left the -- left it to the parents to initiate the, the contact for visit, and then we would check schedules and messaging and set it up

-2-

that way." Grandparents requested 24 hour confirmation from the parents prior to a visit. Grandfather stated this was because of "[m]ultiple missed visits with no indication."

Continuing his testimony, Grandfather stated that Father's job with a window-cleaning company took him all around the southeast. Grandfather stated neither parent complied with mental health treatment. Neither parent would give him their address, and their housing situation was "limited." The parents told Grandfather their electricity was supplied by a running car as well as solar power. Both parents also told Grandfather they smoke marijuana and make "dab," which Grandfather described as a "concentrated form of marijuana." Grandfather then testified to domestic violence incidents regarding Mother: "There have been reports filed in Unicoi County where [Mother] had choked [Father]. She had thrown a knife in the room with him, toward him, and [the Child] was in the room. And I believe there was -- in Greene County, she had a, had a charge for domestic violence there, as well." As to the quality of the parents' visits with the Child, Grandfather stated Mother would interact with the Child while Father would observe the majority of the time or talk to Grandparents. Grandfather stated: "They, since filing, started bringing toys to play with her so they could interact, but prior to that, interaction was not -- I don't know. She -- it was a lot of tickling more than true interaction, I think." Grandfather testified he and his wife have a "[g]reat" relationship with the Child. The Child calls Grandfather "papaw." However, the Child's communication skills are somewhat low, and she is in speech and occupational therapy. Grandfather stated that, in his view, a change of caregivers would be "emotionally detrimental" to the Child.

On cross-examination, Grandfather stated that the parents' visits had to be initiated by the parents. Grandfather is a flight nurse and works 24 hour shifts. Grandfather stated Grandmother is a "stay-at-home mom and now grandma." Grandparents also have two sons, aged 20 and 22. Grandfather stated that since he and Grandmother filed their petition, both parents have reached out more frequently with regard to visitation. As to whether the Child enjoyed these visits, Grandfather stated: "Most of the time. There was the last two visits where she would cling to either [Grandmother] or myself." Since Grandparents filed their petition, Mother and Father had caught up on their child support. Asked to clarify his 24 hour work shifts, Grandfather explained: "It's two shifts per week, but my gone time, sometimes I'll be gone for four days and sometimes I'll be gone six or seven or eight." Grandfather stated he and Grandmother tried to work with the parents on availability for visits. Communications between Grandparents and the parents were contentious on some occasions. Grandfather explained why he insisted on 24 hour notice for visits:

> We requested 24 hour notice because of multiple missed visits, and if they didn't give us a notice that they were not going to show up, then it was -- we'd have to load the baby up and then she would end up waiting in a car

seat unnecessarily. So we asked for 24 hours notice so that we were -- knew that they were -- had planned to show up.

Grandfather stated that Father tended to focus his aggression toward Grandmother during visits. Asked if he and Grandmother tried to "get [Mother and Father] totally off the idea of visiting with [the Child]," Grandfather answered: "No, Sir."

Grandmother testified next. Grandmother testified that from September 8, 2020 through January 8, 2021, she received no child support from Mother or Father. Mother had been ordered to pay $30.00 per month in child support and Father $50.00 per month. Even though the parents failed to pay child support for an extended period, Grandmother testified that they showed up to visits with money and new things suggesting they were doing well financially:

> During the visits, they showed up with new things. I know at one point there was conversation about finances and a wallet being stolen or lost that had his payroll for other people in it. It was quite a large amount. But at the same time, they showed up with, I think it was Dunkin' Donuts, drinks and seemed to be financially okay. He paid for coffee at the coffee house with a $100.00 bill at one point during this time frame.

During the four months prior to the filing of the petition, Mother and Father did not bring anything in the nature of supplies to their visits with the Child. Nevertheless, on their visits, the parents displayed various purchases they had made for themselves: "[Father] had a new phone, bragged about it being kind of expensive. He had new clothes. [Mother] had her hair ombred … where it's kind of different colors going down the back." According to Grandmother: "[T]hey seemed to be financially okay to me, as a mom. I wasn't worried that he was missing a meal or anything." Grandmother used to supervise visits along with her mother at a McDonald's playground, but McDonald's eventually tore down the playground. Grandmother's mother no longer helped supervise visits, and Grandmother refused to supervise visits alone. Grandmother explained: "Truth is I'm afraid of [Father]… [h]e hollers and screams that we've taken his child, that we've done -- everybody has done wrong by him." Grandmother was asked about incidents of domestic violence between the parents:

> Q. Okay. What information do you have with regards to domestic violence between the parents?
> A. I have not witnessed anything firsthand. I have been told by both of them. I have seen...
> Q. What, what has the mother told you about domestic violence between her and the father?

A. Most recently was -- it was before we filed.  We were -- I was at my sister's house with her and she just looked at me, and she said, "What do I need to do to get my child back from you?" and I told her we did not take her, she needed to follow her case plan, and even if she didn't get [the Child] back, she needed to do her mental health stuff and be the best she could for [the Child].  At that point, we started openly talking.  I told her that she needed to make visits, stop canceling, stop not showing up.  At that point, she told me that she was -- I, I asked her why she wouldn't.  She had a black eye, so she missed visits prior to this conversation right before this.  She had had a black eye.  And she proceeded to tell me that she was afraid that I would tell the state.  I told her the state wasn't involved and that [the Child] needed her to make visits.  I made the assumption that [Father] was the one who gave her the black eye.  At that time, we, we openly talked.…

***

Q. Okay. And was that conversation within the four months before the petition was filed?

A. I want to say it was one of the leading causes of why we filed, why we reached out for an attorney at that point.

Q. Okay.  So you indicated earlier in your answer that both parents have had conversations with you about domestic violence.  What conversations have you had with [Father] about domestic violence between the parents?

A. Definitely prior to the four months, he talked a lot about the incidences that she was arrested at.  At some point, he even wrote me a letter stating that if she was to show up, she wasn't to get [the Child], that the police shouldn't give her [the Child].  I'm not even sure how it was worded, but that she was out on bond for Greene County and was maybe getting out of jail in Unicoi County for charges, both stemming from domestic violence, which he did  -- didn't date it, but the time frame's there by the incidents that he's referring to in the letter.

Q. To your knowledge, has there ever been an Order of Protection between the parents?

A. [Father] did get an Order of Protection where he subsequently dropped it, I want to say, five days later...

Q. Okay.

A. ...which I think I was the one that called the police on that.  It was 3:00 in the, or 1:00 in the morning, maybe, and I got a phone call that she had heard it was him and he said he -- she had heard him and that it was really bad, mom, and then I couldn't get back through.  So I got in my car, drove over there.  When I got there, the whole house, all these kids that were living in

the home, young -- well, young people, were all awake and so forth and this big, horrendous thing had happened and I sat there on the bed with [Mother], and I said, "Look, let's go to the hospital or I'm going to call the police 'cause you can't do this." At that point, I did see [Father] had welts around his neck, scratch marks and welts, like bruises, which I believe law enforcement saw, as well, and she was -- she wouldn't go to the hospital, which I really think that's what she needed. Instead, she was arrested for domestic violence, where he did do the protection order but it was short-lived.
Q. To your knowledge, have the parents taken any steps to get counseling or any help with the domestic violence issues?
A. Not that I'm aware of.

Asked what percentage of visits Mother missed during the four months preceding the filing of the petition, Grandmother stated: "I want to say it was more than half." Mother's stated reasons for failing to show up to visits were, variously, that her back hurt; that she was menstruating; or that her teeth hurt (the latter of which Grandmother acknowledged as probably true). As for why the parents were tardy for certain visits, Mother and Father offered excuses such as they were stuck in traffic. Mother and Father would sometimes be late to visits by 10 to 30 minutes. Grandmother testified in regard to a visit for the Child's birthday: "[W]e really did try. But nothing we did and no time frame we gave would work for them, and it was the day before they asked."

Grandmother stated that, when Father was a child, he was diagnosed with "bipolar disorder, episodic dyscontrol syndrome, something like that. I may have that wrong. It's been many years, he's 30 now. He -- ODD, oppositional defiant disorder, and he did receive treatment therapy, long-term residential care, and there was -- it was very difficult when [Father] became a teenager." Grandmother testified that, to her knowledge, Father had not taken medication for his conditions since he was 15 or 16 years old. Grandmother continued: "[Father] also has ADHD. We could not treat the ADHD because it made the anger outbursts worse, so that was fun. He was on lithium, Seroquel. We monitored him. He was very well taken care of with us." Father stopped taking his medications when he reached a certain age and decided he did not want them. According to Grandmother, Father told her he "self medicates" with marijuana. "I think now instead of plain smoking marijuana, they've moved onto, like, the vaping it, which it's oil wax. 'Dab,' I think is what it's called." As to Mother, Grandmother stated: "She's admitted to long-term drug use. She has admitted to acts of violence, has talked about the acts of violence." Grandmother stated that, to her knowledge, Mother had not received any treatment or counseling. Regarding her relationship with the Child, Grandmother testified: "Very good. She's mine. She's my world. I mean I've been taking care of her for over two years now. … she's getting ready to turn three. I, I want to say I'm her mom. She doesn't call me 'mom,' but she doesn't call many people by name." In contrast, Mother and Father

struggled to connect with the Child. Grandmother testified that she did not feel as though Father, in particular, was very interested in playing with the Child.

On cross-examination, Grandmother stated that the Child had to be caught up on her vaccinations and doctor's appointments when she entered Grandparents' care. The questioning then turned to Grandmother's relationship with her son, Father. Grandmother was asked a series of questions about her treatment of Father when he was a child. Grandmother acknowledged having used corporal punishment on Father in the form of spanking him with a belt. However, this did not do any good, so Grandmother stopped. Grandmother also acknowledged having sometimes locked Father in his bedroom for 10 to 20 minutes at a time. Grandmother testified: "It was a little lock. [Father] would get mad and bust the door down. He would -- you couldn't keep [Father] in one place; hence, he was in self-contained classes at school." Asked if her objective from the start was to make the Child her own, Grandmother stated: "Absolutely not." Grandmother said she tried to help Mother and pleaded with her to get the mental help she needed. Grandmother asserted she does not use corporal punishment on the Child.

Mother testified next. Mother stated that before she lost custody of the Child, she took the Child to her doctor's appointments; fed her; comforted her; and kept her clean. Asked if she had gotten the Child her vaccinations, Mother stated: "For the most part…[t]here was some that I didn't much agree with that I was trying to do research on." At that time, Mother did not want the Child visiting with Grandparents. Mother explained: "I felt like the grandparents were, I hate to say it, but vultures…[f]rom the beginning, I felt like they were out to take my child." Mother and Father have lived in a number of residences. However, Mother and Father had lived in the same house for 16 or 17 months by the day of trial. Mother stated that in time, she and Father would have the option to buy the house. Mother works for a window-cleaning company with Father. Asked what she does there, Mother stated: "Well, technically, I'm a floater at the moment 'cause my contract has not started. I'm a manager, I'm a trainer. Of course, I do paperwork, office work." Regarding domestic violence, Mother stated she and Father have had two domestic violence incidents since they got together in February of 2018. Mother acknowledged that when she was eight months pregnant with the Child, she hit herself in the stomach during a spat with Father. Asked if she realized this was not very smart, Mother answered:

It was not, no, but my brain, more or less, went to the fact of, you know, already seeing the grandparents and how they reacted beforehand of me just being pregnant. I did not want to raise a child in the home that we were in … which was not finished. We were far from finished. So that, that put a great big cloud over me, with my house not being finished, the grandparents acting the way they are and my husband acting the way he did, which gives no excuse. I understand that and I shouldn't have done it.

Asked if she planned to comply with recommendations such as parenting classes, Mother stated she was trying.  Mother had caught up on child support, which she paid in cash at the courthouse.  With respect to visitation, Mother testified:

Q. Did you have any problems setting up those visitations?
A. Between mine and my husband, or her husband and my husband's schedule, it has been kind of complicated, but that's kind of on both parties 'cause we do have opposite schedules.
Q. Okay.
A. Also, we've had to work around what schedule I've had when I do go out and train or do this or some -- somewhat.
Q. How many times a month do you try and schedule visitation with your daughter?
A. At first, it was around once a month, 'cause we weren't exact -- I don't think any party was exactly sure of what was supposed to happen or who was supposed to initiate.
Q. Uh-huh.
A. We were all confused at one point.  Then COVID hit and everybody got even more confused on what to do because everything was shut down.  And here lately, we've been doing our best to initiate contact and try to do it as -- to the best of our ability with both parties' schedules.
Q. How much would you like to be able to visit with your daughter?
A. If it was up to me, every week.
Q. Every week?
A. If not, twice a week.  But I know everybody's schedule kind of sucks when it comes to that.
Q. Okay. And you're paying child support and you want to see your daughter?
A. Yes.

Mother acknowledged having made mistakes, but asserted she was going to change.  Mother stated: "I'm doing everything I can, at least."  Mother stated she does not have a meaningful relationship with the Child.  Asked how she would go about establishing a relationship with the Child, Mother stated: "Well, of course, I'd have to spend a lot more time with her.  I'd have to interact with her a lot, especially, when it comes to playing and, you know, talking with her and stuff and letting her re-learn my language, so to speak."  As to whether she has a drug problem, Mother testified: "I smoke hemp, that's it.  I eat hemp."  Mother stated she would rather "eat a plant than take 10 to 15 pills a day."  Mother had been prescribed Vraylar, hydroxyzine, and Zoloft.  However, Mother had "not really continued on" with her mental health treatment.  With respect to the Child's current

situation, Mother stated it would confuse the Child if she were removed from Grandparents' care. Mother did not seek to change the Child's living arrangement in the near-term: "[E]ven though me and [Grandparents] have animosity, I would still try to place in, you know, a transition plan because I know what that can do to kids…." Asked what she would change going forward if given the opportunity to continue visiting the Child, Mother stated: "It'd be a lot more outside play. There'd be a lot more toys. There would be a lot more learning toys, I guess is the best way I can explain it."

On cross-examination, Mother stated that DCS had offered her services, but she never received "one voucher" or "one phone number." Mother paid rent on her current residence, but the purported owner lacks a deed to the house and is trying to "do the transition in [a] will to actually have it put in her name…." Mother paid $200 in rent to this person who did not own the house. Mother's residence is not connected to the power grid. Asked whether the inspector had been to the home to determine its eligibility, Mother stated: "He has once or twice, but it seems like every time that we do get him out there he keeps adding new things, even though he just told us to do certain things, and it's like he's wanting us to do a step up from that." In the meantime, Mother and Father use solar energy. "If it's just the fridge and a couple of lights, it can last anywhere from 24 to 48 hours." However, Mother added: "Now if we're running, let's say, a power saw for over two hours, will last around eight to 10. It really depends on what kind of wattage we're using and how long we're using it." Mother was then shown documentation to the effect that the last child support payment she made before the petition was filed was made on August 17, 2020. Mother stated she was not sure this was accurate as she has had "problems out of my paperwork." Mother had no documents to show she made any child support payments between August 17, 2020 and January 8, 2021. Besides the Child, Mother has two other biological children, twin boys. Mother does not have custody of her twins; she lost custody of them after she dropped one of them and a case was opened against her. Mother's mother has custody of the twins.

Mother was then asked whether she complied with the requirements set out by the Juvenile Court before she could petition either for increased visitation with the Child or for the Child's return to her custody. One of these requirements was that Mother follow the recommendations of a parenting assessment. Mother stated: "I have tried to do that, like I said, but I could not get vouchers or paperwork of any sort. All these people were telling me, 'I don't take that case,' or, 'I want five hundred,' well, anywhere between three hundred and $500.00 for these classes. I tried to get vouchers." Another recommendation was that Mother obtain a GED; Mother said this "confused" her and she was trying. Mother also had not established a primary care doctor. Mother stated she has some "aggravating" but "miniscule" health issues. Mother stated that, as a result of a "family gene ordeal," she has no upper teeth. Mother had her upper teeth removed at a clinic and received dentures.

As of trial, Mother had not set up any substance abuse education classes. Asked if she would likely pass a drug screen, Mother stated: "Most likely, yes. But, once again, I eat and smoke CBD, which, also, has THC in it." Mother clarified that she would, in fact, fail a drug screen for marijuana. Asked why she had not continued to follow recommendations with respect to a mental health assessment, Mother stated that her team of social workers and/or therapists had retired and she had not found a new support system she was comfortable with. Mother acknowledged having physically assaulted Father in front of an officer. Mother said this was "a detrimental mistake on my side." Mother was asked about undergoing anger management, family counseling, domestic violence counseling, or parenting classes, and her consistent response was that she had not received any phone numbers or vouchers for such classes. Mother acknowledged an incident in which she physically assaulted Father in the presence of the Child. Mother stated that she has never had a driver's license; she only has a learner's permit. Regarding Mother's ability to pay child support, Mother acknowledged making a $200 payment on October 27, 2020 toward fines associated with a "domestic and resisting arrest" offense. Asked if this payment was made during a time when she not paying child support, Mother stated: "No, Ma'am, not at that moment. We were trying to keep everything diverse so we weren't sitting there broke because of bills."

Asked about an incident whereby she received a black eye, Mother said her black eye came from Father "accidentally elbow[ing]" her when the two of them were working on a car. Mother was then asked about her failure to get the Child all of her vaccinations. Mother responded: "If I do not agree with a shot, why would I give it to my child?" As to her mental health diagnoses, Mother stated she has bipolar disorder, anxiety, and depression. Finally, asked why it took Grandparents filing a petition seeking to terminate her parental rights before she began to regularly visit the Child or pay child support, Mother testified: "It was, more or less, confusion about COVID, number one, 'cause everything was closed, so I think all parties were kind of confused on what to do because nobody wanted to go to each other's house, nor could we. And with everything closed, what are we supposed to do?"

Father was next to testify. Father works for a window-cleaning company, where he is a manager and has anywhere from five to 14 people working under him at a time. Father himself sometimes cleans windows and pressure washes. The work is both commercial and residential. Mother works at the same company. Referring to his 1099 form, Father stated his gross income for 2020 was $18,861.00. Father had worked at this window-cleaning company for around a year and four months as of trial. Father's job involves a lot of travel as he cleans the windows of fast food restaurants around the country. Father is out of town for around two weeks per month. Father has to pay for motels for other employees as well as his own expenses. Father spent around $9,000 in the past year on

-10-

expenses. Father was asked whether he paid any child support in the relevant time frame leading up to the petition's filing:

Q. And they have alleged that you have abandoned [the Child] by failing to make reasonable payments toward her support. Sitting here today, can you say you made any payments, child support payments, between September 8, 2020 and January 8, 2020, or 2021?

A. I'd have to refer back to the paperwork like my wife, but I know I made payments and I know when I couldn't get to the courtroom, or courthouse because they were closed during the COVID stuff, and Unicoi County was closed off and on and I -- like I said, I'm only in town a little bit here and there. So I'd show up there, they'd be closed, I wouldn't be able to do anything. I have called Darrin Shelton on multiple occasions and so has my wife. He said not to worry about it, they weren't putting warrants out for anybody's arrest during the COVID. I would show [Grandparents] that I have their child support money and I have shown them many a'times that I had their child support money, that the courthouse was closed. During visitations, I told them this.

Q. Let me ask you this.

A. They would tell me not to worry about it.

Q. Let me ask you this. When you were in court in Unicoi County with Judge Shults, did that Court tell you how you had to make your child support payments?

A. Yes, Sir. I had to pay...

Q. What did Judge Shults tell you?

A. Paid cash at the Juvenile Court area of the courthouse, like the, the office for Juvenile Court. I had to...

Q. So he told you you had to make the payments in person?

A. Yes, Sir.

Q. And you couldn't mail any payments?

A. We called Darrin and asked if we could mail them in and he said no and he said no to us paying with a card, also.

Q. Okay. Have you -- in that, in that same period, September 8, 2020, January 8, 2021, have you given or offered any nonmonetary support for [the Child], like clothing, diapers, wipes, anything like that?

A. Yes, Sir. We have actually offered and asked her -- asked [Grandparents] if they needed anything, and they told us, "No, she's just fine," on multiple occasions. Every visitation, we ask her that.

Q. Have the petitioners ever refused to accept any tangible items of nonmonetary support from you?

-11-

A. One time over a toy, they told us to just take the toys with us. Otherwise, I don't know what happens to any of the toys we buy so -- and, yes, we have boughten (sic) stuff for our daughter.

Q. Okay. Has there been Christmas gifts, things like that?

A. Yes, Sir. We had Christmas at Cracker Barrel before Christmas, or I can't remember if it was before Christmas or right after Christmas. But I actually made a big ordeal about having a visitation for Christmas.

Q. Okay. And you think you may -- gave Christmas gifts at that time?

A. I did.

Q. Okay.

THE COURT: Christmas what year? 2020?

A. This last year.

THE COURT: 2020?

A. Yes….

Father testified that Grandparents refused him visitation with the Child on the Christmas before last. Father elaborated: "I really feel a lot of looking for manipulation in it or, 'You're going to do it my way. I'm not working with you.' My mom knows many a'people. She could have many a'people come with her for us to have more visitation." As to why he missed certain visits, Father stated the parties' schedules were off. On one occasion, Father skipped a visit because it was raining and the Child "don't need to be outside in the rain because we can't go to an inside visitation because of COVID." Father stated that often times on visits he talks to Grandparents so as to allow Mother to have quality time with the Child because Grandmother "blurts out things." Regarding what he does on visits, Father stated: "I tell [the Child] I love her, 'Daddy loves you.' I've counted with her. I have done colors with her a couple times." The Child had referred to him as "dad" or "daddy," but does not do so anymore. Father testified he does not feel as though he has the relationship with the Child he should. Father stated he had been begging for reunification for the past seven months.

Father then was asked about the results of a psychosocial assessment he took. The report stated that Father needed a psychiatrist for medication management to assist with "affect regulation and impulse control." Father testified: "I refused to ever take meds again in my life. I'm -- I cannot be a lifeless drone and carry out my job. If you need me to further explain 'lifeless drone'…." Father stated that the medication he took as a child made him feel horrible and he was "very violent" while on them. Asked if he thought he could benefit from therapy for learning empathetic or social skill development, Father stated: "No, Sir. I don't feel I need that. Even in my current job, I'm, literally, out in the public all over the United States. I do perfectly fine socializing with other people." Father stated, however, that he did not object to parenting classes. Regarding electricity at his residence, Father stated he has a solar power system as he has had issues with the county

inspector on getting hooked up the grid.  Father stated this solar power system operated everything in the house that needed operating.  For heating, Father has a wood stove.  On the subject of DCS services, Father stated he did not partake in these because he could not afford them and could not get a voucher.  Father stated he tried but failed to obtain a parenting assessment.  Father testified that he has no outstanding legal issues.  Father stated that all of Mother's legal issues were resolved, as well.

On cross-examination, Father characterized part of his work as "just driving around listening to music."  Father was shown a document reflecting he paid $100 in child support on August 17, 2020, the same day Mother made her last child support payment before the petition was filed.  Father explained: "We, typically, do 90 percent of everything in our life together."  Father stated his child support was paid in full as of trial.  While Mother underwent a parenting assessment, Father underwent a psychosocial assessment.  Father testified to his refusal to cooperate with medication or psychotherapy:

Q. The first recommendation, that you obtain medication management from a psychiatrist, which you testified that you did not agree with, correct?
A. I'm going to tell you like I tell everybody, nobody's going to force me to eat medication.
Q. All right.  But the second recommendation is psychotherapy.
A. I don't need psychotherapy, I don't need a therapist.
Q. So you simply refuse and state that you don't need psychotherapy, that's why you...
A. I don't need psychotherapy because...
Q. ...did not follow that recommendation?
A. ...because my mother or CPS and you say I need it.

***

Q. The next recommendation is individual and group therapy.  Is that a recommendation you plan on following?
A. I'm actually okay with, with the family therapy thing that's on here.  But, like, I don't feel like I should have to discuss my problems with any other human being except for between me and my wife.
Q. Okay.  And have you made any attempts to obtain family counseling?
A. I -- my wife went and called a whole bunch of numbers and nobody would help us with anything.
Q. Did you make any attempts to obtain family counseling?

-13-

A. I have to work, Ma'am. I work constantly. Whether it -- whether it's I'm working on the house, whether out helping the neighbor or helping somebody, helping somebody broke down on the side of the road, it doesn't matter, I, literally, work constantly, not necessarily for monetary gain. Sometimes it's just to be a decent human being.

Father was shown a series of messages between him and Grandparents to the effect that they were not refusing him visitation. Father said he does not do video visits with the Child because his mother will "monopolize" the visits. Father then explained his views on authority in general:

Q. What I'm asking is you, you just saw just a few minutes ago with your attorney the copy of the final court Order from Unicoi County Juvenile Court...
A. Uh-huh.
Q. ...that states exactly what you have to do to work towards reunification, correct?
A. Yes, but you also can't force anybody on this earth to do exactly as you want them to do. That is illegal. It's called slavery and fascism...
Q. You understand that that's...
A. ...which is illegal.
Q. Whether you want to follow those recommendations or not, that is the orders...
A. Everybody had laws -- has laws…
Q. That's not [Grandparents'] choice?
A. ...and rights. Where your feelings begin, my rights don't end. Where my feelings begin, your rights don't end, and that's, literally...
Q. But you understand that was not...
A. ...that's, literally, how I don't -- you can't force somebody to do something that is against their body and their will. The medication will make me sick and make it where I cannot provide for anybody, let alone myself.
Q. But you understand that those recommendations and the orders of the Court were not...
A. I have not...
Q. ...the choices made -- let -- can I finish my question, please?
A. I have not been on meds since I was 14 years old, Ma'am. I'm not going back on them.
Q. I'm trying to ask you a question. You understand that [Grandparents] aren't the ones that came up with those recommendations and orders, right?
A. It's just a recommendation, though.

Q. The Court's Order says that you have to follow the recommendations of that assessment, correct?

A. (No audible response.)

Q. And the Court's Order doesn't -- says that if you want reunification with your child, that's what has to happen. It doesn't say you have to do these things. It says you have to do them if you want reunification. Do you understand that?

A. So you're telling me I have to do exactly what my mother and Child's Protective Services wants yet I'm a grown adult? That's not how this works and I -- my attorney was a hack job last time that didn't stand up for anything proper even though I prevent -- presented him with plenty of evidence.

Q. Do you understand that the Judge is the one who wrote and signed that Order, that [Grandparents] didn't make up those -- the court Order, they...

A. [Grandparents]...

Q. ...didn't have a say in it?

A. And [Grandparents] and the guardian ad litem pretty much had say-so of whatever happened and it was their way and nobody else's way was okay and the only people they listened to was them.

Q. But you're saying that you want...

A. I'm saying that...

Q. ...reunification but you're not...

A. ...there was enough perjury at the last...

Q. ...willing to follow the Court orders?

A. ...court date that when I, or if this doesn't go right, I've got my own ordeals to handle legally with this state.

THE COURT: What do you mean?

A. I plan on going after Unicoi County with a lawsuit. Like, my boss is already in on it, too. So I have the funding to do it, finally, something I didn't have before.

Tony P., owner of the company Mother and Father work for, was the last witness to testify. Asked how he would characterize Father's demeanor, Tony P. stated: "Professional and very hyperactive and hardworking, outgoing." Tony P. testified Father has no problem expressing his opinions to him. Regarding Mother, Tony P. said he was pleased she was going to continue working for the company. Asked if he had offered to fund a lawsuit against Unicoi County like Father testified to, Tony P. replied he had not.

In July 2021, the Trial Court entered its final judgment terminating Mother's and Father's parental rights to the Child. The Trial Court found, by clear and convincing evidence, that the ground of abandonment by failure to support was proven against Mother and Father. The Trial Court also found the ground of abandonment by failure to visit was proven against Father; it did not rule on this ground with respect to Mother although the ground was alleged against her. The Trial Court found further that Grandparents failed to prove the ground of persistent conditions against either parent. Lastly, the Trial Court found that termination of Mother's and Father's parental rights is in the Child's best interest. In its detailed final judgment, the Trial Court found, in pertinent part:

10. Respondents' home is not suitable for children. It failed multiple inspections for electrical power, and Respondents have rigged a solar system that charges a bank of car batteries to provide limited power to the home. There is no hot water.
11. Respondents have no ownership in the property and no lease agreement.
12. The relevant four-month period for abandonment for both of Respondents is September 8, 2020, to January 7, 2021.
13. During the four months prior to the filing of the Petition, the parties had planned for seven visits—essentially two times per month, and mother attended three and father attended two visits during the entirety of the relevant four-month period.
14. Besides [the Child], the Petitioners' youngest son lives with them. There is no evidence of any domestic problems in the home of Petitioners.
15. The Unicoi County Juvenile Court allowed supervised visitation by Respondents. Petitioners were responsible for providing the supervision. The Respondents visited [the] child on September 7, 2020, and missed their visit scheduled for September 24, 2020. The Parties used FaceBook Messenger to establish their visits. The reason the Respondents missed the September 24, 2020, visit was they believed rain precluded the visit. There was a pavilion at the arranged visit point and the rain excuse was unpersuasive.
16. On October 2, 2020, Mother cancelled before her visit—claiming she lacked a ride. Both parties visited the child on October 21, 2020. Parties were offered November 1, 2020, and they indicated they could not attend, and they refused a video visit. The Mother and Father did visit with [the] Child on November 19, 2020. On December 8, 2020, they visited but were 30 minutes late. Mother was scheduled to visit on December 18, 2020, but missed and Father was out of town.

17. Both parents are capable of working. Father travels throughout the Southeast cleaning windows at [fast food restaurants]. He also coordinates with other individuals to fulfil[l] a window cleaning contract at numerous restaurants. He had started this job four months prior to the relevant four-month period.

18. Mother's work history is less clear. She has worked at Krispy [Kreme], a gas station, and then for her husband since they lost custody of their child,

19. Mother and Father refused to give their address to Petitioners. In the past Mother and Father had used marijuana, and now they consume a substance called "Dabs" which is a concentrated form of marijuana. The Dabs the Respondents use are a highly concentrated form of CDB, and it is unclear from the evidence that the Dabs they are using contain any THC.

20. During the Respondents' visits with the child, Father has very little interaction with [the Child] and most interaction is between the Mother and child.

21. Although [the Child] will be three years old [in] August … 2021, she communicates at the level of a sixteen-month child. The Petitioners are working with and have arranged taking her to occupational and speech therapy. Therapy started in February 2021. The therapies are weekly for 45 minutes for each therapy session.

22. Petitioner [Grandfather] is [a] flight nurse, and he works 24-hour shifts in several states. [Grandmother] stays at home with [the Child] and their 20-year-old son.

23. Father dislikes and resents his mother. His rage is unsettling. This aggressiveness was evident in the courtroom as Father demonstrated distinct anger and temper towards her during his testimony. It would be distressing for [Grandmother] to be in the presence of her son alone.

24. For visits with [the Child], the Petitioners require 24-hour confirmation. This is reasonable because of Respondents['] inconsistency in appearing for scheduled visits.

25. During video conferencing, Father engages [Grandmother] more than he does the child.

26. During the relevant four-month period prior to the filing of this cause of action, neither Respondent paid child support to Petitioners. Mother is required to pay $30.00 a month, and he is required to pay $50.00 per month. During this same period, Father would carry large amounts of cash and would often purchase small items, such as coffee, with a $100 bill.

27. After the filing of this action, Respondents began paying, more or less regularly, the limited child support ordered by the Unicoi County Juvenile Court.

28. The parents have not provided material items for the child, although they exhibited to the Petitioners new clothes, a newly-acquired expensive phone, and hairstyling to indicate they were not having difficulty finding money to pay for things. Respondents had discretionary funds but refused to make minimal child support payments.

29. Father suffered from bi-polar disorder, ADHD, and oppositional defiant disorder as a child. Now Father self-medicates with marijuana. When Respondents did have the care of [the Child], the child was behind on her vaccinations and doctor appointments.

30. Mother has engaged in long-term drug use and various acts of violence. When she was eight months pregnant with [the Child], she locked herself in her car and beat her own belly and cut herself. She has committed domestic abuse towards Father, which left marks on Father's neck. [The Child] was present when this occurred. Furthermore, Mother has physically struck a police officer.

31. In early 2020, Respondents provided power to their … home by running automobiles to charge a bank of car batteries in the home.

32. When the parents had custody of [the] Child until she was six to eight months old, they lived in multiple residences, at least one of which was an unfinished home.

33. Mother provided various excuses for not receiving mental health care— for example blaming providers' retirements. She has substituted smoking and eating hemp for mental health medications prescribed for her.

34. Mother made $8,000 in 2020 working for [a window-cleaning company], and she expects to have a contract with the organization to earn more money in 2021.

35. Respondents' home lacks a working cooktop, the washer and dryer do not work, there is no hot water, the basement is partially open to the outside, the bathroom is under renovation, the upstairs is partially finished, and she burns candles to mask the musky smells in the home. The home is heated by a wood stove in the basement.

36. When [the Child] was present, Mother did threaten to harm herself with a kitchen knife.

37. Mother would fail a drug screen for marijuana.

38. Mother has not participated in anger management classes, family counseling or domestic violence classes. No testimony was offered to contradict Mother's assertion that DCS failed to assist her in obtaining classes.

39. Mother has never had a driver license, but she now has a learner's permit.

40. Mother suffers from untreated bipolar disorder, anxiety and depression.

41. Father earned $18,861 in 2020 working for [a window-cleaning company]. In addition to cleaning [fast food restaurant] windows, he arranges for others workers [sic] to clean [fast food restaurant] windows in various locales throughout the nation.

42. Petitioners and Respondents struggled to schedule Respondents' visits with [the] Child. Based on the testimony and demeanor in Court, the difficulty in communicating, the impasses on meeting times, and the general hostility displayed in communicating and meeting between the parties is a direct result of Father's intransi[g]ence, contempt for Petitioners—especially his mother, and his determination to undermine authority. Mother is secondarily [responsible] for the difficulty, because she follows the lead of Father.

43. Father's attitude towards authority goes beyond a streak of independence and second-guessing into open contempt and hostility toward anyone who does not comply with his viewpoints. For example, Father said his boss was going to fund a lawsuit against Unicoi County related to Father's grievances, but his employer denied this.

\*\*\*

2.1 Abandonment by Failure to Visit—Father

\*\*\*

The relevant four-month period that is prior to the filing of the Petition is September 8, 2020 to January 7, 2021. During this relevant four-month period, Father did visit [the Child] on two occasions. However, the parties had only agreed upon two short visits per month. Due to the limited amount of visitation, the question is whether the visits constituted "token visitation"….

\*\*\*

Neither parent has a healthy parental relationship with [the Child]. Their efforts have not been sufficient to demonstrate a reasonable attempt to forge a meaningful relationship with the child. The parents refused several offers to visit, were late to some visits and were no-shows on others. Significantly as to Father, he engaged his time at visits focused on his mother instead of interacting with [the Child]. Certainly, by clear and convincing evidence his visits were token. The parents have done little to seek court-ordered expansion of their parenting time, nor have they requested the Unicoi

Juvenile Court to establish a visitation schedule. The Petitioners did not preclude or impede parents in scheduling parenting time.

Wherefore, the Court finds that Petitioners proved by clear and convincing evidence the statutory grounds of termination of parental rights against Father for abandonment of the child by willful failure to visit the child pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i).

### 2.2 Abandonment by Failure to Support—Father

During the relevant four-month period for determining abandonment by Father is September 8, 2020 to January 7, 2021. Father never paid or offered any support for [the] Child during the relevant four-month period. As to whether the failure to support was willful, Father offered no persuasive explanation on why he failed to pay. He was working during the relevant four-month period, and he never indicated he could not afford the payment. Finally, he was carrying large bills of money that was observed by Petitioners, and he seemed to have acquired new clothing and an expensive mobile phone. His excuse that he was not allowed or able to make a payment at the courthouse in Unicoi County during the entirety or any portion of the four-month period was unbelievable. His child support was set low, and Father willing[ly] elected not to pay support until the Petition was filed.

Wherefore, the Court finds that Petitioners proved by clear and convincing evidence the statutory grounds of termination of parental rights against Father for abandonment of the child by willful failure to support the child pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i).

### 2.3 Abandonment by Failure to Support—Mother

Again, the four months preceding the filing of the Petition is September 8, 2020 to January 7, 2021. During this period of alleged abandonment by failure to support, Mother made no financial payment to support [the] Child. She provided no tangible in-kind support during the relevant four-month period.

The question is whether Mother proved, by a preponderance of the evidence, that her failure to support [the Child] during this period was willful. Having found that Mother failed to support [the] Child during the relevant four-month period for the statutory termination ground of abandonment, the Court must conclude whether Mother was persuasive that she had "justifiable excuse" for not financially supporting the Child.

\*\*\*

Mother failed to persuade the Court she was unable to provide some support to her child. She provided no support, and the evidence was not persuasive that she lacked the ability or means to make small payments. She could have mailed support to the attention of the Petitioners. Mother was capable of working, and she and Father had established a household together prior to the four-month period. Mother made $8,000 during the year 2020, and the total of her four child supports payments [sic] during the relevant four-month period was $120. She never made the first $30 payment. She willing[ly] refused to make a child support payment as a result of malice to Petitioners and disregard of her child support order.

Wherefore, the Court finds that Petitioners proved by clear and convincing evidence the statutory grounds of termination of parental rights against Mother for abandonment of the child by willful failure to support the child pursuant to Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102(1)(A)(i).

\*\*\*

Upon a review of the various orders entered in the Juvenile Court of Unicoi County regarding [the] Child, there was an order that reflects a finding of dependency, neglect, or abuse with respect to [the] Child that was entered on April 24, 2019. This order reflects that an adjudicatory hearing was held on March 13, 2019, and the order states "[t]he parents stipulated to dependent and neglected." The threshold question before this Court is what are the conditions that led to the child's removal that still persist? A court speaks thru its orders, and it is the Juvenile Court's adjudicatory hearing order that is the location for the answer to this question.

-21-

As a component of the adjudicatory hearing, the juvenile court "shall include findings of fact in its adjudicatory order." Tenn. R. Juv. P. 307(e)(2). Turning to the April 24, 2019, adjudicatory order, there were no findings of fact regarding the conditions that led to the Child's removal from Respondents. Instead, Respondents stipulated to a finding that [the] Child was dependent and neglected in in [sic] the Unicoi County Juvenile Court. Stipulations are of two kinds, some being "mere admission of fact relieving a party from the inconvenience of making proof, while others have all the characteristics of concessions of some rights ...." 73 Am. Jur. 2d Stipulations § 14.

In this case, the stipulation of dependency and neglect carried no recitation of the stipulated facts that supports a finding that a child is dependent and neglected. In its absence, the Court is left with two choices, assume that all allegations in the underlying petition seeking the finding of a dependent and neglect adjudication are true or the record is impermissibly lacking in necessary findings to preclude this Court from finding by clear and convincing evidence the termination ground of persistence of conditions.

"[Parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). Therefore, the law for terminating parental rights requires clear and convincing evidence to support a factual and legal conclusion that a statutorily defined termination ground has been proven. Even if it is assumed that a stipulation in Juvenile Court is broad enough to assume the entirety of the dependency and neglect petition is true, the Court must speculate as to whether some or all of the allegations were relevant to sum and substance basis of the finding of dependency and neglect. Further, more allegations regarding the parents were recited in the *Ex Parte Motion for Transfer of Custody to the State*. This Court is bound by the findings of the Juvenile Court, and the finding[s] of fact are insufficient for this Court to determine what conditions led to the removal of [the] child.

As to the dispositional hearing, which is designed to determine proper placement of a child determined to be dependent, neglected or abused, the Unicoi County Juvenile Court record does not reflect a notice of hearing for a dispositional hearing, rather, all orders after the adjudicatory hearing simply notified the parents the case was future docketed for a "status hearing" on various dates listed in each respective order. No order indicated the case

-22-

was ever docketed for a "dispositional hearing" although the custody of the Child was addressed at the various subsequent status hearings.

For these reasons, this ground was not proven by clear and convincing evidence.

Wherefore, the Court finds that Petitioners failed to prove by clear and convincing evidence the statutory grounds of termination of parental rights against Mother or Father for failure to remedy persistent conditions pursuant to Tennessee Code Annotated section 36-1-113 (g)(3).

\*\*\*

4.1 Best Interests—Applied to Mother-Child Relationship

\*\*\*

The evidence was persuasive that Mother has engaged in domestic violence directed to Father. Mother's mental health conditions remain untreated, and she and Father use home remedies of herbal variations of THC for their mental ailments. This is not inconsistent with her long-term drug usage. Beyond the drug-usage, the home is unfit for human habitation—it has failed multiple inspections seeking qualification for electrical power. Mother has failed to make adjustments to her circumstance, modes of conduct and the conditions of her home for it be a safe home for [the] Child. This factor favors terminating the parent-child relationship between Mother and [the] Child.

\*\*\*

The evidence was unpersuasive as to what reasonable efforts were made available by social services agencies. This factor neither favors or disfavors terminating the parenting-child relationship between Mother and [the] Child.

\*\*\*

Mother maintained minimal but at least monthly short visits with Child. Mother's custody of [the] Child was disrupted two years prior, but she has exhibited the most minimal of effort to regain regular time with her child. She misses visits frequently, and the visits she takes are often less than an hour. Two hours per month, at most, is not a characteristic of regular

visitation and contact with one's minor child. This factor does not favor preserving the parent-child relationship.

*\*\**

[The Child] and Mother have a relationship on the level of acquaintance. A relationship takes an investment of time, and Mother's efforts to position herself for more time, or to actually petition for more time [are] mostly nonexistent or at least minimal. Time apart in this case indicates a lack of meaningful relationship. This factor does not favor preserving the parent-child relationship.

*\*\**

[The Child's] development is lagging, and Petitioners are attempting to address the Child's needs in that regard. Mother will not address her own problems, let alone the needs of a child that is of perfunctory interest to her. Mother's physical environment is unfit for a child, and her untreated mental health conditions leave her unfit to effectively parent. [The Child] will suffer emotionally if she is dependent upon Mother to assist her in thriving and becoming a well-adjusted and flourishing child. This factor does not favor preserving the parent-child relationship.

*\*\**

The evidence was persuasive that Mother committed domestic violence against Father, against [the] unborn [Child] when Mother was eight months pregnant, and against one of her twin children when she dropped him. Her emotional instability makes her prone to physical brutality against members of her family. This factor does not favor preserving the parent-child relationship.

*\*\**

Mother's home is unfit as it is not healthy and safe. Mother and Father both are using mind- and mood-altering substances that render them unable to care for [the Child] in a safe and stable manner. This factor does not favor preserving the parent-child relationship.

*\*\**

Mother's mental health is poor due to her avoidance and rejection of recommended treatment. She will not provide safe and stable care and supervision of [the Child]. This factor does not favor preserving the parent-child relationship.

\*\*\*

The parties failed to produce evidence that Mother is paying child support consistent with the child support guidelines. No child support has been calculated applying these rules. However, Mother has paid child support consistent with the Juvenile Court's support order. This factor does not favor terminating the parent-child relationship.

\*\*\*

Time keeps passing with Mother failing to correct her housing situation and failing to actively pursue more than a token relationship with [the] Child. Meanwhile, Mother is prone to commit domestic violence in her home, which may have some connection to her untreated mental health conditions. These are the most important and significant factors that make the parent-child relationship tenuous. There is not much to suggest that preserving Mother's parental rights is in the Child's best interests. Accordingly, it is the best interest of [the Child] to terminate Mother's parental rights.

4.2 Best Interests—Applied to Father-Child Relationship

\*\*\*

Father's mental health conditions remain untreated, and Father and Mother use home remedies of herbal variations of THC for their mental ailments. The Respondent's home was unfit for habitation and is no safe place for a child. The home has failed multiple inspections to qualify for electrical power, among other problems. Father has failed to adjust his circumstance, modes of conduct, and the conditions of his home for it be a safe home for [the] Child. This factor favors terminating the parent-child relationship between Father and [the] Child.

\*\*\*

The evidence was unpersuasive as to what reasonable efforts where made available by social services agencies. This factor neither favors or disfavors terminating the parenting-child relationship between Father and [the] Child.

\*\*\*

Father's visits with [the] Child were mostly pointless. The evidence was persuasive that he was [there] because Mother was conducting her visits with [the] Child. This factor does not favor preserving the parent-child relationship.

\*\*\*

[The Child] and Father have little to any interaction and no relationship. This factor does not favor preserving the parent-child relationship.

\*\*\*

[The Child's] development is lagging, and Petitioners are now attempting to address this nagging issue. Father will not address his own problems, let alone the needs of a child. Father's physical environment is unfit for a child, and [the Child] will suffer emotionally if she is dependent upon Father to assist her in thriving and becoming a well-adjusted and flourishing child. This factor does not favor preserving the parent-child relationship.

\*\*\*

The evidence was persuasive that Mother committed domestic violence against Father, and she is part of Father's household. This factor does not favor preserving the parent-child relationship.

\*\*\*

Father's home is unfit as it is not healthy and safe. Mother and Father both are using mind- and mood-altering substances that render them unable to care for [the Child] in a safe and stable manner. This factor does not favor preserving the parent-child relationship.

\*\*\*

Father's emotional status is notable for underlying rage against others in his family and disregard for authority. His emotional issues will not resolve under his own willpower, he needs and refuses assistance. He will not provide safe and stable care and supervision of [the Child]. This factor does not favor preserving the parent-child relationship.

***

The parties failed to produce evidence that Father is paying child support consistent with the child support guidelines. No child support has been calculated applying these rules. However, Father has paid child support consistent with the Juvenile Court's support order. This factor does not favor terminating the parent-child relationship.

Father's housing situation is deplorable, and it is the most recent of several unstable housing arrangements he has bounced from since the birth of [the Child]. His relationship with [the Child] is nonexistent and primarily derivative of Mother's passing interest in [the] Child. These are the most important and significant factors that indicate the parent-child relationship is of no benefit to [the Child]. There is nothing to suggest that preserving Father's parental rights is in the Child's best interests. Accordingly, it is the best interest of [the Child] to terminate Father's parental rights.

Mother and Father timely appealed to this Court.

## **Discussion**

Father raises the following issues on appeal, as restated slightly: 1) whether the Trial Court erred in finding the ground of abandonment by failure to support; 2) whether the Trial Court erred in finding the ground of abandonment by failure to visit; and 3) whether the Trial Court erred in finding that termination of Father's parental rights is in the Child's best interest. Mother raises the following issues on appeal, as restated slightly and consolidated: 1) whether the Trial Court erred in finding the ground of abandonment by failure to support and 2) whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest. Although not stated exactly as such, Grandparents raise the following additional issues on appeal: 1) whether the Trial Court erred in failing to find the ground of abandonment by failure to visit against Mother and 2) whether the Trial Court erred in failing to find the ground of persistent conditions against both Mother and Father.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own

determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Regarding witness credibility, our Supreme Court has stated:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014).

Multiple grounds for termination of parental rights are at issue on appeal. On January 8, 2021, when Grandparents filed their termination petition, the grounds at issue were set out in statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g) (West March 6, 2020 to April 21, 2021).

The definitions of abandonment relevant to the issues on appeal were set out in statute as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or

-32-

guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

\*\*\*

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

\*\*\*

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1) (West March 6, 2020 to June 30, 2021).

Beginning with Father's issues, we first address whether the Trial Court erred in finding the ground of abandonment by failure to support. The relevant time period for our review, and the one correctly used by the Trial Court in its analysis, is September 8, 2020 through January 7, 2021. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed* ("[T]he applicable four month window ... includes the four months preceding the day the petition ... is filed but excludes the day the petition is filed."). The Trial Court found that Father failed to make any child support payments during the applicable four month window. On appeal, Father argues that any failure to pay child support on his part was not willful. Under the abandonment statute as amended by the time Grandparents filed their petition, a parent's lack of willfulness is an affirmative defense, and a parent has the burden of proving his or her lack of willfulness by a preponderance of the evidence. Father asserts he was told by the Juvenile Court clerk not to worry about paying child support because "they weren't putting warrants out for anybody's arrest during the COVID." In his brief, Father states: "[A]ny failure to support the Child during the relevant four-month period was unintentional or involuntary, so it may not be characterized as willful."

The Trial Court did not credit Father's excuse, and we find no clear and convincing evidence in this record that would serve to overturn the Trial Court's credibility determination. In addition, even if the Juvenile Court clerk told Father "not to worry" about paying child support, that erroneous statement made without any authority obviously would not relieve Father from his obligation to support his child. Even if Father understood that he would not be arrested for not paying child support, this in no way serves as a legitimate excuse for his not paying child support. Father failed to prove by a preponderance of the evidence that his failure to pay any child support in the relevant time period was not willful. The evidence does not preponderate against the Trial Court's findings relative to this issue. We find, as did the Trial Court, that the ground of abandonment by failure to support was proven against Father by clear and convincing evidence.

Continuing with Father's issues, we address whether the Trial Court erred in finding the ground of abandonment by failure to visit. The relevant time period for our review, and the one correctly used by the Trial Court in its analysis, is September 8, 2020 through January 7, 2021. The Trial Court found that Father visited the Child on two occasions in the relevant period;[4] that he focused his attention on Grandmother rather than the Child

---

[4] The visitation calendar in the record suggests Father actually visited the Child three times in the relevant four month period.

-34-

during these visits; that he was late to some visits and a no-show at others; that he refused some offers to visit; and he has not petitioned the Juvenile Court to establish a visitation schedule. The Trial Court concluded that Father's visits were token in nature. Against this, Father argues: "The problems with scheduling the Parents' visitation—and the circumstances of this individual case—as reflected in the record and stated above, clearly demonstrates that any failure to visit by Father was unintentional and involuntary."

Once again, the Trial Court found Father's excuses unavailing. There is no clear and convincing evidence in this record that would serve to overturn the Trial Court's credibility determination. In addition, the evidence does not preponderate against the Trial Court's dispositive findings relative to this issue. Despite Grandparents' willingness to work with Father, Father exercised very little visitation with the Child, and such little visitation as he did engage in was largely "pointless" as found by the Trial Court in its best interest analysis. Father has failed to prove by a preponderance of the evidence that his failure to visit the Child in more than a token manner during the relevant period was not willful. We find, as did the Trial Court, that the ground of abandonment by failure to visit was proven against Father by clear and convincing evidence.

We next address Grandparents' issue of whether the Trial Court erred in failing to find the ground of persistent conditions against Father. There appears to be no dispute that a petition for dependency and neglect was filed below, and more than six months passed after the Child's removal before the termination petition was filed and the matter was heard. The Trial Court found, however, that due to a lack of specific findings in the underlying dependency and neglect adjudication, this ground cannot be established because the original conditions that necessitated the Child's removal are undiscernible. In their brief, Grandparents argue that (1) the statute recognizes "other conditions" may exist making it unsafe for the child to return to the care and custody of the parents; (2) that the Trial Court's termination order is "rife" with findings showing it would be unsafe for the Child to return to Father's care; and (3) that it is possible to glean from the Juvenile Court's prerequisites for reunification the conditions that necessitated removal, these prerequisites being: comply with the recommendations of assessments, secure safe and stable housing, secure stable legal income, and resolve legal charges.

Upon our review, we agree with Grandparents. As this Court has previously explained, the "conditions" in "persistent conditions" need not be the identical conditions that necessitated a child's removal in the first place:

> To prove persistent conditions, it is not necessary that the same conditions exist at the time of trial as existed when the children were removed from their parents' care. *In re A.L.B.*, No. W2008-02696-COA-R3-PT, 2009 WL 1856023, at *8 (Tenn. Ct. App. June 30, 2009). Indeed, the language of the

statute is unambiguous that persistent conditions are established if evidence shows the existence of conditions that led to the children's removal **or other conditions** that in all reasonable probability would lead to further abuse or neglect. Tenn. Code Ann. § 36-1-113(g)(3)(A). As the *A.L.B.* court found, the ground is proved through clear and convincing evidence of conditions showing that it is reasonably probable that the children would be subjected to further abuse and neglect if they were returned to their parent, regardless of whether the conditions are the same as when the children were removed or not. *In re A.L.B.*, 2009 WL 1856023, at *8.

*In re Dustin T.*, No. E2016-00527-COA-R3-PT, 2016 WL 6803226, at *15 (Tenn. Ct. App. Nov. 17, 2016), *no appl. perm. appeal filed*. (Emphasis in original).

In its very detailed termination order, the Trial Court found, among other things, that the house Father lives in is unfit for human habitation and that Father has untreated mental health issues. These constitute "other conditions" that, in all reasonable probability, would cause the Child to be subjected to further abuse or neglect. It is not dispositive that these conditions may not be the identical conditions that necessitated the Child's removal. Based on this record, there is little likelihood that these conditions will be remedied at an early date so that the Child can be safely returned to Father in the near future. Further, the continuation of the parent-child relationship greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home. We, therefore, find that the ground of persistent conditions was proven against Father by clear and convincing evidence.

The last issue of Father's we address is whether the Trial Court erred in finding that termination of Father's parental rights is in the Child's best interest. When Grandparents filed their termination petition in this matter, the statutory best interest factors read as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

Father makes several arguments against the Trial Court's best interest determination, to wit: (1) the Trial Court was inconsistent in finding the ground of abandonment by failure to support against Father and then crediting him for paying child support in its best interest analysis; (2) there was no competent evidence for the Trial Court's finding that the Child communicates at the level of a sixteen-month old or that the Child would suffer emotionally if she were dependent upon Father for thriving and becoming a well-adjusted Child; (3) that the Child has referred to Father as "dad" and has some knowledge that he is her father; and (4) that the Trial Court failed to take into account the impact on the Child of its decision to reduce Father to the role of a complete stranger. Father states further that any negative conduct of his was not irredeemable.

First, there is nothing inconsistent about the Trial Court's findings with regard to child support. Father failed to pay any child support during the four months leading up the filing of the petition. Father then belatedly caught up on paying child support after the petition was filed. Father could not repent of his failure to pay child support for purposes of the ground of abandonment by failure to support after the applicable four month period had run, but it was appropriate for the Trial Court to credit Father for his later payment of child support as part of its best interest analysis. Second, the evidence from trial established that the Child has low communication skills and that she is in therapy to address this issue.

-37-

It was appropriate for the Trial Court to consider, as part of its best interest analysis, the evidence showing that Grandparents attend to the Child's health needs whereas Father's ability or willingness to do the same is very much in doubt. Third, the fact that the Child has referred to Father as "dad" is not, on its own, evidence of a meaningful relationship. Fourth, Father makes conclusory arguments that his behavior is not irredeemable and suggests that the Trial Court failed to take into account the impact on the Child of his being reduced to a complete stranger. On the contrary, the Trial Court made detailed factual findings as to each statutory best interest factor. The evidence does not preponderate against the Trial Court's detailed factual findings relative to this issue. We are satisfied that the Trial Court, as shown in its detailed best interest findings, considered the likely impact of reducing Father to the role of a complete stranger to the Child. Based on the Trial Court's findings and in view of the evidence in this record, Father by his own choice is practically a stranger to the Child already.

As found by the Trial Court, Father has untreated mental health issues. At the hearing below, Father testified defiantly that no one can force him to do what he does not want to do. He testified further that he does not believe he should have to discuss his problems with anyone but his wife. Based on his testimony, it is unlikely that Father will ever agree to receive the mental health treatment he needs before he can safely parent the Child. To Father's credit, he began paying child support and visiting the Child more regularly after the petition was filed against him. However, it is too little and too late. The Child is thriving in Grandparents' care and receiving the care she needs. The Child should not have to wait for permanency any longer. We find by clear and convincing evidence, as did the Trial Court, that termination of Father's parental rights is in the Child's best interest.

Turning to Mother's issues, we address whether the Trial Court erred in finding the ground of abandonment by failure to support against her. The relevant time period for our review, and the one correctly used by the Trial Court in its analysis, is September 8, 2020 through January 7, 2021. The Trial Court found that Mother failed to pay any child support during the relevant time period. On appeal, Mother concedes she failed to pay child support during the relevant time period, but argues there is no evidence her failure to pay was willful. Under the abandonment statute as amended by the time Grandparents filed their petition, the burden was on Mother to prove by a preponderance of the evidence that her failure to pay child support in the relevant period was not willful once her failure to pay was established. Mother argues, among other things, that the Trial Court erred in finding that she failed to pay child support out of malice toward Grandparents when there is no evidence of such malice in the record. Mother also relies on Father's non-credible excuse about the Juvenile Court clerk telling him not to worry about paying child support.

Mother's arguments are unpersuasive. First, Mother testified at trial that she considered Grandparents "vultures" trying to take her child. That qualifies as malice. Second, the Trial Court did not credit Father's excuse about the Juvenile Court clerk telling him not to worry about paying child support. That excuse is equally unavailing for Mother. The Trial Court correctly noted that Mother could have simply mailed Grandparents the child support. None of Mother's excuses are valid. Nevertheless, in her brief, Mother states: "It stretches the imagination to think that a mother, regardless of how poor a mother she may have been, could permanently and forever lose her child over an innocent or unknowingly failure to pay a total of $120.00 over a 120-day period, literally a dollar a day!" Respectfully, that is entirely backwards. As found by the Trial Court, Mother's excuses for her failure to pay child support are unavailing, so her failure to pay child support was not "innocent." Furthermore, if the low amount of child support is to be made an issue, that makes it all the more puzzling why Mother did not simply pay this small amount when she had the means to do so given what was at stake. During the relevant time period, Mother made a $200 payment on a fine but did not send the Child even one dollar in child support. The evidence does not preponderate against the Trial Court's findings relative to this issue. Mother failed to prove by a preponderance of the evidence that her failure to pay child support in the relevant period was not willful. We find, as did the Trial Court, that the ground of abandonment by failure to support was proven against Mother by clear and convincing evidence.

We next address Grandparents' issue of whether the Trial Court erred in failing to find the ground of abandonment by failure to visit against Mother. The relevant time period for our review is September 8, 2020 through January 7, 2021. The Trial Court did not rule one way or the other on this ground with respect to Mother even though Grandparents alleged it and evidence was presented on this ground. Grandparents point out that the Trial Court made certain findings that applied equally to both parents. Grandparents assert further that, based on the testimony and a visitation schedule contained as an exhibit in the record, Mother visited the Child fewer times than did Father during the relevant four month period, yet the Trial Court declined to find the ground of abandonment by failure to visit against Mother while finding it against Father.

The Trial Court found Mother visited the Child three times in the relevant four month period and Father visited twice. These numbers appear to be reversed. The visitation calendar shows Mother and Father visited the Child on October 21 and November 19, 2020; Father alone also visited on December 8, 2020. However, even proceeding on the basis that Mother made three visits in four months as found by the Trial Court, her visits still were paltry. The Trial Court found: "Neither parent has a healthy parental relationship with [the Child]. Their efforts have not been sufficient to demonstrate a reasonable attempt to forge a meaningful relationship with the child. The parents refused

several offers to visit, were late to some visits and were no-shows on others." The evidence does not preponderate against these findings.

Although the Trial Court put special emphasis on Father's particular lack of interest in visiting the Child, the Trial Court's other material findings on this issue apply equally to Mother. Mother's visits were few and far between. She did little if anything to increase her visitation schedule. The very few visits Mother did undertake did not amount to much. Both in terms of quantity and quality, in light of the specific circumstances of this case, we have no serious or substantial doubt that Mother's visits with the Child were token in manner. In addition, Mother failed to prove by a preponderance of the evidence that her failure to engage in more than non-token visitation during the relevant four month period was not willful. We, therefore, find that the ground of abandonment by failure to visit was proven against Mother by clear and convincing evidence.

We next address Grandparents' issue of whether the Trial Court erred in failing to find the ground of persistent conditions against Mother. The Trial Court found that due to a lack of specific findings in the underlying dependency and neglect adjudication, this ground cannot be established because the original conditions that necessitated the Child's removal are undiscernible. We already have discussed our disagreement with this interpretation of the statute. The Trial Court found in its termination order that the house Mother lives in is unfit for human habitation and that Mother has untreated mental health issues. These constitute "other conditions" that, in all reasonable probability, would cause the Child to be subjected to further abuse or neglect. Based on this record, there is little likelihood that these conditions will be remedied at an early date so that the Child can be safely returned to Mother in the near future. Further, the continuation of the parent-child relationship greatly diminishes the Child's chances of early integration into a safe, stable, and permanent home. We, therefore, find that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Trial Court erred in finding that termination of Mother's parental rights is in the Child's best interest. Mother states that she does not favor "plucking" the Child out of Grandparents' home right away. Rather, Mother argues that her conduct was not irredeemable and her situation may improve one day. Mother states: "No one is harmed by leaving the situation as it is today." Mother also points to the Trial Court's finding that there is "not much to suggest" preserving Mother's parental rights is in the Child's best interest. Mother states that perhaps that means there is *something* to suggest preserving Mother's parental rights is in the Child's best interest.

Mother's arguments are without merit. Whether termination of Mother's parental rights is in the Child's best interest is a fact-intensive inquiry; the purely hypothetical possibility that Mother may someday be fit to parent the Child is not factually based. In addition, we very much disagree with Mother that no one is harmed by leaving the situation as-is. The Child is in a less-than-ideal middle ground—cared for by Grandparents in actual fact while Mother retains her parental rights. So long as this arrangement prevails, the Child will be denied permanency in her status.

The record shows that Mother began to visit and pay child support more regularly after Grandparents filed their petition. However, it is in the nature of too little, too late. Mother has unresolved mental health and domestic violence issues. She lives in a house that is not fit for human habitation. There is no hint in the record that Mother will remedy these issues any time soon. In addressing whether termination of Mother's parental rights is in the Child's best interest, the Trial Court made detailed factual findings as to each statutory factor. The evidence does not preponderate against the Trial Court's detailed factual findings. We find by clear and convincing evidence, as did the Trial Court, that termination of Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Trial Court is affirmed as modified, resulting in affirmance of the termination of Mother's and Father's parental rights to the Child. This cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Alexandria Y., and her surety, if any, and one-half against the Appellant, Ricky B., and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE